**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**

Joel L. Smith

    v.                              Civil No. 07-cv-408-SM

William Wrenn, Commissioner,
New Hampshire Department of
Corrections, et al.[1]

**O R D E R**

    Joel Smith has filed this civil rights action (document no. 1) pursuant to 42 U.S.C. § 1983, alleging that the defendants have violated his constitutional rights by denying him adequate medical care during his confinement at the New Hampshire State Prison.  The matter is presently before the Court for a preliminary review to determine whether or not the complaint states any claim upon which relief might be granted, or whether the complaint should be dismissed.  See United States District Court District of New Hampshire Local Rule ("LR") 4.3(d)(2); 29 U.S.C. § 1915A (requiring the court to preliminarily screen any "complaint in a civil action in which a prisoner seeks redress

---

[1]In addition to William Wrenn, Smith names the following individuals as defendants to this action: New Hampshire State Prison ("NHSP") Warden Richard Gerry, Director of Medical and Forensic Services for the New Hampshire Department of Corrections Robert McLeod, NHSP Nurse Coordinator Donna Timulty, NHSP Nurse Donna Dufresne, and NHSP Nurse Brad Bowden.

from a governmental entity or officer or employee of a
governmental entity.").

<u>Standard of Review</u>[2]

Under this Court's local rules, when an incarcerated
plaintiff commences an action pro se and in forma pauperis, the
magistrate judge is directed to conduct a preliminary review. LR
4.3(d)(2). In conducting the preliminary review, the Court
construes pro se pleadings liberally, however inartfully pleaded.
<u>See</u> <u>Erickson v. Pardus</u>, ___ U.S. ___, 127 S. Ct. 2197, 2200
(2007) (following <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976) and
<u>Haines v. Kerner</u>, 404 U.S. 519, 520–21 (1972) to construe pro se
pleadings liberally in favor of the pro se party). "The policy
behind affording pro se plaintiffs liberal interpretation is that
if they present sufficient facts, the court may intuit the
correct cause of action, even if it was imperfectly pled." <u>See</u>
<u>Castro v. United States</u>, 540 U.S. 375, 381 (2003) (noting that
courts may construe pro se pleadings so as to avoid
inappropriately stringent rules and unnecessary dismissals of
claims); <u>Ahmed v. Rosenblatt</u>, 118 F.3d 886, 890 (1st Cir. 1997).

---

[2]Counsel has appeared in this matter, however, the complaint
was originally filed pro se, and will be preliminarily reviewed
according to the standards applied to screening pro se
complaints.

2

All of the factual assertions made by a pro se plaintiff and inferences reasonably drawn therefrom must be accepted as true. See id.  This review ensures that pro se pleadings are given fair and meaningful consideration.

## Background

Joel Smith is a Maine State inmate currently being housed at the New Hampshire State Prison ("NHSP").[3]  On March 26, 2007, at 3:30 a.m., Smith was awoken by extreme abdominal pain.  At 5:00 a.m., when the pain became unbearable, Smith summoned corrections officers ("C.O.'s") on his housing unit.  The C.O.'s immediately notified the NHSP infirmary that Smith was having a medical emergency.  Smith was examined by the nurse on duty, who directed that Smith be transferred to the Catholic Medical Center ("CMC") in Manchester.

At the CMC, Smith was examined, provided with pain medication and given a CT scan.  CMC physician Dr. Selleck

---

[3]Smith is housed at the NHSP pursuant to an agreement entered into between the corrections departments of Maine and New Hampshire, pursuant to the New England Interstate Corrections Compact, codified in New Hampshire at N.H. Rev. Stat. Ann. § 622-A, which authorizes states to house one another's inmates pursuant to mutually acceptable terms delineated by the statute. See N.H. Rev. Stat. Ann. § 622-A:2, Art. III.

diagnosed Smith with a large kidney stone.  Wanting to try to let the stone pass on its own, Dr. Selleck prescribed Percoset, a narcotic, every six hours for pain, and ibuprofen, and said that he wanted to follow up with Smith in person in a couple of days. Smith was then returned to the NHSP.

At the prison, Smith was not provided with the Percoset prescribed, and was instead given another narcotic painkiller, Vicodin, which, Smith reports, was not as effective as the Percoset in managing his pain.  Additionally, the prison would give Smith only three doses of pain medication a day, leaving a twelve hour gap between 8:00 p.m and 8:00 a.m. when he received no pain medication.  As a result, Smith was kept awake all night on March 27, 2007 and March 28, 2007, with pain.  When, on the morning of March 29, Smith complained to DOC nurse Donna Dufresne that he was not receiving pain medication he needed at night, Dufresne told him that he had received his 8:00 a.m. medication, that he should leave the line, and that if he persisted in complaining, she would have him transferred to the prison's Special Housing Unit.

Smith attempted to return to his unit, but collapsed on the way.  When Smith finally made it back to his unit, he told C.O.

Brown what had happened on the medication line.  Brown agreed to take Smith's written complaint to the infirmary.  Brown returned twenty minutes later and told Smith that he had tried, but that he would be unable to assist him.  While in his cell, Smith passed out several more times from uncontrolled pain.

At 11:00 a.m., Smith went to eat lunch.  C.O. Lanbrou noticed that Smith was in extremely bad shape.  Another officer would not let Smith go to work that day, due to the severity of his condition.  Smith returned to his cell and collapsed.  When he regained consciousness, Smith went to find Lanbrou to get help, and he passed out on his unit in front of Brown, Unit Manager Lucie Bilodeau, Case Manager Robert McGrath, C.O. Gauthier, and Lanbrou.  Smith was taken to the infirmary in a wheelchair.

At the infirmary, Nurse Brad Bowden examined Smith, but was unable to help him.  Because Smith was on the floor of the infirmary vomiting, the NHSP Nursing Coordinator, Donna Timulty, decided to send Smith back to CMC.

At the CMC, Smith was given pain medication and an ultrasound.  The ultrasound revealed that the abnormal location of his kidney was making nonsurgical resolution of the kidney

stone impossible.  The doctor on duty told the transporting prison officers that he could not, in good conscience, send Smith back to the NHSP to await surgery, because the NHSP medical staff was not adequately managing Smith's pain.  Smith was therefore admitted to the hospital to await surgery.

On March 30, 2007, Smith had surgery.  According to Smith's description of the procedure, Dr. Selleck pushed the kidney stone back into the kidney, and placed a stent to keep the stone in place, and to keep Smith's "tubes" open.  Dr. Selleck advised Smith that the stent should remain in until Smith followed up with him in a few days.  A catheter was also placed.  On March 31, Smith was returned to the NHSP infirmary, to be housed there until the catheter was removed.

On April 6, 2007, Smith had still not seen the doctor for his follow-up visit.  When he asked about the appointment, Smith was told there had been some mix-up, and that he would see the doctor "sooner than later."  On April 9, Smith was taken to the Elliot Medical Center in Manchester to see Dr. Selleck.  After examining Smith, Dr. Selleck said the stent would be in place until it could be surgically removed.  Dr. Selleck wanted to

perform this procedure within a matter of weeks of that appointment.

Smith was returned to the infirmary on April 9.  On April 10, the catheter was removed and Smith was returned to his unit. He was told that his antibiotics and pain medication would follow him to his unit.  When, a couple of days later, he had not received any medication, he returned to the infirmary where he was told that he would not be receiving his medication.

On April 17, 2007, Smith reported to the 8:00 a.m. medication line and unsuccessfully tried to obtain pain medication or other assistance for abdominal pain.  The next day, Smith provided an NHSP nurse with a urine sample which, he reports, was extremely dark.  The nurse told him the urine sample looked fine, however, and took no further action.

Over the next ten days, Smith's pain increased, causing him to lose consciousness a number of times.  Smith attempted to get assistance in the medication line but was sent away.  C.O.'s on Smith's unit called the infirmary, and again Smith was taken to the infirmary in a wheelchair.  After being examined by a physician's assistant, who found that there was blood in Smith's urine, Smith was returned to his unit.

7

During the first several weeks of April, Smith stopped being able to eat for a period of seven days, and lost twenty-five pounds.  On or about April 20, 2007, Smith's supervisor at the prison woodshop, Mr. Boudreau, immediately recognized that Smith was in extreme distress upon seeing him.  On Smith's behalf, Boudreau contacted both Smith's doctor's office and NHSP Warden Richard Gerry.

Due to Boudreau's intervention, Smith got antibiotics, and his condition began to improve.  On April 27, however, Smith's pain began to increase again.  The NHSP physician's assistant told Smith to stop taking his antibiotics, as test results showed he was not taking the appropriate drug to treat his particular infection.  He was switched from antibiotic to antibiotic in an unsuccessful effort to get his infection under control. Complications and pain from uncontrolled infections lasted over the following four and a half months.

On May 7, 2007, Smith was given written instructions to stop taking all of his medication, which he believed meant that his surgery was imminent, as an order to discontinue medication was standard procedure for preparing an inmate for surgery that was a few days off.  Seven days later, Smith had still not received

8

medication or been taken to the hospital for surgery, and his condition again began to deteriorate.  Smith went to the infirmary and was given pain medication, but not antibiotics. Smith states that although C.O.'s he encountered noticed his worsening health, no one would intervene on his behalf, as they were aware Boudreau had been threatened with termination for contacting Smith's doctor's office.

On May 17, 2007, Smith was taken to the CMC for surgery. Dr. Selleck told Smith he would try to break up the kidney stone with the use of a laser.  Dr. Selleck was not able to do that, however, because of the unusual location of his kidney.  Instead, Dr. Selleck replaced the stent with a larger stent, and informed Smith that more tests would be needed before he could proceed further.  Smith was returned to the prison and to his housing unit.

Over the next few weeks, Smith fought severe infections and debilitating pain.  Smith states that his dire condition was obvious to anyone who saw him.  After several more weeks, Smith was taken to the hospital for a follow-up appointment for tests that Dr. Selleck had ordered, but that had never been done.

By mid-July 2007, Smith's condition had continued to worsen. Timulty had threatened to transfer Smith to the Special Housing Unit if he continued to complain of his ailments, however, so Smith stopped reporting to sick call for help.  Smith states that he had increased blood in his urine, and his pain became so severe that he could barely walk.  Finally, Boudreau again contacted the NHSP infirmary on Smith's behalf.  Nurse Bowden took a urine sample and gave Smith a pass for thirty days of bedrest, but was unable to take any further action to improve Smith's condition or symptoms.

The urinalysis subsequently showed that Smith's infections were out of control, and would require, in addition to the regimen of antibiotics Smith was already taking, injections of additional antibiotics every eight hours.  None of these infection-fighting measures was successful.  Smith was also given narcotic pain medication four times a day.

On July 25, 2007, Smith was again told to stop taking all of his medications.  He continued his medications until the supply he had was gone, on July 27 or 28.

Approximately ten days later, on August 8, 2007, Smith was taken back to the hospital where he had laser surgery.  He was

told that the doctors would not immediately know whether or not the surgery had been successful in breaking up the kidney stone, and was returned to his unit at the prison.  Smith states that he was in medical distress at the time, and an officer had to escort him to his cell, or he would not have been able to get there on his own.

On August 17, 2007, Smith went to the infirmary with constant pain and symptoms of infection.  After he had waited for an hour, Timulty told Smith to come back the following Monday, as the infirmary was short-staffed that day.  Timulty also said that the responsibility for Smith's lack of treatment lay with the State of Maine, for failing to approve medical tests, causing the cancellation of appointments.  Smith was given medication and returned to his unit.

On August 20, 2007, Smith, again, was taken to the Elliot Medical Center for follow-up on tests that had not been done. Smith contacted members of his family who called the Maine Correctional authorities.  With the assistance of this outside help, Smith was able to facilitate communication between Maine and New Hampshire that finally eased his receipt of necessary medical tests and treatment.

On August 24, 2007, Smith's previously cancelled appointment for a CT scan to determine whether or not the kidney stone had been successfully broken up by his most recent surgery, was rescheduled.  At that time, Smith was represcribed the dosage of Vicodin he had been taking, but it was not effective due to the severity of Smith's pain.

On August 30, 2007, Smith was taken to see Dr. Selleck for a follow-up appointment.  Dr. Selleck told Smith that the CT scan did not reveal the status of Smith's kidney stone, due to the abnormal location of Smith's kidney.  Dr. Selleck told Smith that although ideally he would like to remove the stent, Smith was too sick to undergo surgery.  Dr. Selleck told Smith and the medical officials at the NSHP that Smith had to return for surgery in a week, and that in the meantime, he needed to be treated with antibiotics.

On September 9, 2007, Smith was returned to the hospital for the final operation on his kidney.  Dr. Selleck advised Smith that the stent had been in so long that it had crusted shut, and was blocking the release of toxins from Smith's body.  As a result, the toxins were recirculating into Smith's system, which

was what was causing him to be so ill.  The surgery resolved the condition, and within a few days Smith was greatly improved.

Discussion

I.   Section 1983

Section 1983 creates a cause of action against those who, acting under color of state law, violate federal constitutional or statutory law.  See 42 U.S.C. § 1983[4]; City of Okla. City v. Tuttle, 471 U.S. 808, 829 (1985); Wilson v. Town of Mendon, 294 F.3d 1, 6 (1st Cir. 2002).  In order for a defendant to be held liable under § 1983, his or her conduct must have caused the alleged constitutional or statutory deprivation.  See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 692 (1978); Soto v. Flores, 103 F.3d 1056, 1061–62 (1st Cir. 1997).  Here, Smith claims that defendants are state actors, and that they violated his federal

---

[4]42 U.S.C. § 1983 provides that:

> Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

constitutional right to receive adequate medical care during his
incarceration.  Smith's claim arises, therefore, under § 1983.

II.  <u>Access to Adequate Medical Care</u>

     The Eighth Amendment protects prison inmates from prison
officials acting with deliberate indifference to their serious
medical needs.  <u>See</u> <u>Farmer v. Brennan</u>, 511 U.S. 825, 831 (1994).
To assert a viable cause of action for inadequate medical care,
an inmate must first state facts sufficient to allege that he has
a serious medical need for which adequate care has not been
provided.  <u>Farmer</u>, 511 U.S. at 831; <u>Rhodes v. Chapman</u>, 452 U.S.
337, 347 (1981); <u>Estelle</u>, 429 U.S. at 106.  The inmate must then
allege that a responsible prison official was aware of the
serious medical need, or of the facts from which such a need
could be inferred, and still failed to provide treatment.
<u>Estelle</u>, 429 U.S. at 106.  A serious medical need is one that
involves a substantial risk of serious harm if it is not
adequately treated.  <u>Barrett v. Coplan</u>, 292 F. Supp. 2d 281, 285
(D.N.H. 2003); <u>Kosilek v. Maloney</u>, 221 F. Supp. 2d 156, 180 (D.
Mass. 2002) (citing <u>Farmer</u>, 511 U.S. at 835–47); <u>see</u> <u>also</u>
<u>Gaudreault v. Salem</u>, 923 F.2d 203, 208 (1st Cir. 1990) (defining
a serious medical need as one "that has been diagnosed by a

physician as mandating treatment, or one that is so obvious that
even a lay person would easily recognize the necessity for a
doctor's attention.") (internal citations omitted).

"[A]dequate medical care" is treatment by qualified medical
personnel who provide services that are of a quality acceptable
when measured by prudent professional standards in the community,
tailored to an inmate's particular medical needs, and that are
based on medical considerations.  United States v. DeCologero,
821 F.2d 39, 42–43 (1st Cir. 1987).  This does not mean that an
inmate is entitled to the care of his or her choice, simply that
the care must meet minimal standards of adequacy.  Kosilek, 221
F. Supp. 2d at 160–161.  Deliberate indifference may be found
where the medical care provided is "so clearly inadequate as to
amount to a refusal to provide essential care."  Torraco v.
Maloney, 923 F.2d 231, 234 (1st Cir. 1991).  Constraints inherent
in a prison setting may affect the choice of care provided, and
may be relevant to whether or not prison officials provided
inadequate care with a deliberately indifferent mental state.
Wilson v. Seiter, 501 U.S. 294, 302 (1991).

Here, Smith had a kidney stone causing him obvious and
extreme pain, as evidenced by the fact that C.O.'s, as well as a

15

civilian DOC employee, were able to easily observe Smith's
medical distress.  While Smith was initially treated for this
condition, and did receive some care for his ongoing pain and
infections, he alleges that the treatment he received was
inadequate to meet his medical needs.  Specifically, Smith claims
that his extreme pain, lack of adequate pain medication, and the
inadequate treatment of his severe and persistent infections
resulted in a worsening of his already serious condition and
pain, and the unnecessary complication of his treatment.  Smith
lays the blame for the severity of his illness with the prison's
inattention to his obvious and serious medical needs, and an
unreasonable delay in getting him appropriate medical care.

I find that for purposes of preliminary review, Smith has
alleged that, while incarcerated at the NHSP, he had serious
medical needs: a kidney stone, extreme pain, and persistent
infections.  Further, smith has alleges sufficient facts to
demonstrate that the defendants were clearly aware, or should
have been aware, of these conditions.

Less clear is whether or not Smith will be able to prove
that prison officials here were deliberately indifferent to his
medical needs.  Smith's narrative indicates that while under the

care of the NHSP, Smith received several surgeries, was seen a number of times by NHSP medical staff, and was provided with testing, medication, and access to both on-site and off-site care.  For purposes of preliminary review, however, I must construe the allegations in the complaint liberally and in Smith's favor.  In so doing, I find Smith has alleged the minimum facts necessary to allege that the severity of his condition and symptoms was due, at least in part, to inattention to Smith's complaints, inadequate care, response, and treatment, and delay in providing care to Smith by the NHSP defendants.  Accordingly, I find that Smith has sufficiently stated an Eighth Amendment claim for inadequate medical care to allow this action to proceed against the defendants at this time.

III. <u>Supervisory Liability</u>

"Supervisory liability under § 1983 cannot be predicated on a respondeat theory, but only on the basis of the supervisor's own acts or omissions."  <u>Aponte Matos v. Toledo Davila</u>, 135 F.3d 182, 192 (1st Cir. 1998) (internal citations omitted).  A supervisor must be "either was a primary actor involved in, or a prime mover behind, the underlying violation."  <u>Camilo-Robles v. Zapata</u>, 175 F.3d 41, 43-44 (1st Cir. 1999).  There must be "an

affirmative link, whether through direct participation or through conduct that amounts to condonation or tacit authorization" to the violation alleged.  Id. at 44.

Defendants Wrenn, Gerry, McLeod, and Timulty each serve a supervisory function within the DOC.  Although there is no supervisory liability in § 1983 actions based on a respondeat superior theory of liability, a defendant supervisor can be held liable based on the defendant's actual notice of facts sufficient to render the official responsible for reasonable inquiry into the complaint.  See Feliciano v. Dubois, 846 F. Supp. 1033, 1045 (D. Mass. 1994) (citing Layne v. Vinzant, 657 F.2d 468 (1st Cir. 1981)).  A supervisor also may be held liable for his own acts, or omissions, if they rise to the level of reckless or callous indifference to the constitutional rights of others.  See Febus-Rodriguez v. Betancourt-Lebron, 14 F.3d 87, 91-92 (1st Cir. 1994).  Finally, a supervisor may be held liable under § 1983 if he or she "formulates a policy or engages in a practice that leads to a civil rights violation committed by another."  Camilo-Robles v. Hoyos, 151 F.3d 1, 7 (1st Cir. 1998).

Crediting Smith's allegations as true, as I must, I find that defendants Wrenn, Gerry, McLeod, and Timulty each knew of

plaintiff's serious medical condition, ongoing pain, and need for
prompt treatment, and nevertheless failed to take any steps to
ensure the requisite care would be provided in a timely fashion.
These allegations state the minimal facts necessary to allow
plaintiff's Eighth Amendment claim to proceed against defendants
Wrenn, Gerry, McLeod, and Timulty in their supervisory
capacities.

IV.   Official/Individual Capacity Suits

Smith asserts that he intends to sue the defendants only in
their official capacities.  Because each defendant works for the
DOC, a suit against them in their official capacities is a suit
against the DOC, which cannot be held liable for money damages
under § 1983 because of the immunity afforded state agencies
under the Eleventh Amendment.  See P.R. Aqueduct & Sewer Auth. v.
Metcalf & Eddy, Inc., 506 U.S. 139, 144 (1993) (absent waiver,
neither a state nor its agencies may be subject to suit in
federal court); Will v. Mich. Dep't of State Police, 491 U.S. 58,
71 (1989) (holding that neither a state nor its officials acting
in their official capacities are "persons" under § 1983).  Yet,
to obtain the prospective injunctive relief plaintiff seeks here,
he must bring this action against defendants in their official

capacities.  <u>See</u> <u>id.</u> at 71 n.10; <u>see</u> <u>also</u> <u>Brandon v. Holt</u>, 469

U.S. 464, 471-72 (1985) (suing an officer in his or her official

capacity is another way of suing the public entity that the

official represents); <u>Ex parte Young</u>, 209 U.S. 123, 159-60

(1908).

On the other hand, in order to obtain the monetary relief he

seeks, Smith must pursue his claims against defendants in their

individual capacities.  Liberally construing the complaint in

plaintiff's favor, as I am required to do at this preliminary

stage of review, however, I find that Smith intends to bring this

action against the defendants in both their official and

individual capacities because he seeks both injunctive and

monetary relief.

<u>Conclusion</u>

For the foregoing reasons, and without further comment on

the merits of the claims alleged, I find that Smith has

sufficiently stated the minimum facts necessary to allow this

action to proceed against defendants Wrenn, Gerry, McLeod,

Timulty, Dufresne, and Bowden.  I order the complaint (document

no. 1) be served on Defendants.  The Clerk's office is directed

to serve the New Hampshire Office of the Attorney General ("AG"),

as provided in the Agreement On Acceptance Of Service, copies of
this order and the complaint (document no. 1 & 7).  <u>See</u> LR
4.3(d)(2)(C).  Within thirty days from receipt of these
materials, the AG will submit to the court an Acceptance of
Service notice specifying those defendants who have authorized
the AG's office to receive service on their behalf.  When the
Acceptance of Service is filed, service will be deemed made on
the last day of the thirty-day period.

     As to those defendants who do not authorize the AG's office
to receive service on their behalf or whom the AG declines to
represent, the AG shall, within thirty days from receipt of the
aforementioned materials, provide a separate list of the last
known addresses of such defendants.  The Clerk's office is
instructed to complete service on these individuals by sending to
them, by certified mail, return receipt requested, copies of
these same documents.

     Defendants are instructed to answer or otherwise plead
within twenty days of acceptance of service.  <u>See</u> Fed. R. Civ. P.
12(a)(1)(A).

     Plaintiff is instructed that all future pleadings, written
motions, notices, or similar papers shall be served directly on

21

the Defendants by delivering or mailing the materials to them or
their attorneys, pursuant to Fed. R. Civ. P. 5(b).

**SO ORDERED**.

James R. Muirhead
United States Magistrate Judge

Date:      April 9, 2008

cc:        Joel L. Smith
           Lawrence Vogelman, Esq.