UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Joel L. Smith,
     Plaintiff

     v.                               Civil No. 07-cv-408-SM
                                            Opinion No. 2009 DNH 091
William Wrenn, Commissioner,
New Hampshire Department of
Corrections, et al.,
     Defendants


**O R D E R**


     Plaintiff, Joel Smith, a state prisoner, is serving a life
sentence for murder imposed by the State of Maine.  He is
currently (and was, at all times relevant to this proceeding)
housed at the New Hampshire State Prison ("NHSP"), in Concord,
New Hampshire.  He brings this action seeking $1 Million in
compensatory and punitive damages, claiming defendants violated
his constitutionally protected rights by showing deliberate
indifference to his serious medical needs.  See generally 42
U.S.C. § 1983.  Specifically, Smith claims that he received
inadequate and/or untimely treatment for a kidney stone, causing
him to suffer repeated infections and substantial pain over a
prolonged period.


     Defendants move for summary judgment, asserting that: (1)
Smith failed to timely exhaust available administrative remedies,

as is required by the Prison Litigation Reform Act; and (2) even if he had properly exhausted, the undisputed facts of record do not support his Eighth Amendment claim.  Smith objects and has himself moved for summary judgment.

For the reasons set forth below, the court concludes that even if Smith is assumed to have timely exhausted available prison administrative remedies, his Eighth Amendment claim against defendants fails as a matter of law.  Defendants are, then, entitled to summary judgment.

## Standard of Review

When ruling on a party's motion for summary judgment, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor."  Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990).  Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence."  Int'l Ass'n of

<u>Machinists & Aerospace Workers v. Winship Green Nursing Ctr.</u>, 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).

Nevertheless, if the non-moving party's "evidence is merely colorable, or is not significantly probative," no genuine dispute as to a material fact has been proved, and "summary judgment may be granted." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50 (1986) (citations omitted). The key, then, to defeating a properly supported motion for summary judgment is the non-movant's ability to support his or her claims concerning disputed material facts with <u>evidence</u> that conflicts with that proffered by the moving party. <u>See generally</u> Fed. R. Civ. P. 56(e). It naturally follows that while a reviewing court must take into account all properly documented facts, it may ignore bald assertions, unsupported conclusions, and mere speculation. <u>See Serapion v. Martinez</u>, 119 F.3d 982, 987 (1st Cir. 1997).

**Background**

Crediting the allegations in Smith's own affidavit as true, <u>see</u> Affidavit of Joel Smith, Exhibit A to complaint (document no. 1), and based upon the inmate requests slips Smith filed, the material facts are as follows. On March 26, 2007, Smith was awakened by severe pain in his lower left abdomen. He was transported to Catholic Medical Center for treatment. There, he

3

was examined, given pain medications, and underwent a CAT scan.
The treating urologist, Dr. William Selleck (not a defendant),
diagnosed Smith as having a large kidney stone.  He prescribed
Percocet and Ibuprofen for pain management, told Smith that he
believed the stone would pass, and said he wanted to see Smith
again in a few days.

Smith was returned to the prison.  He complains that the
prison infirmary did not stock Percocet and, therefore, provided
him with Vicodin to manage his pain.  Although he suggests that
this was either negligent or, perhaps, even a deliberate and
callous effort to harm him, he does not offer any reason to think
that the substitution of Vicodin for Percocet was medically
inappropriate.  He does, however, say that his pain continued for
the next two days until, on March 28, 2007, he collapsed in his
cell and was taken to the prison's infirmary by wheelchair.
Again, he was transported to Catholic Medical Center for
treatment.  There, he was provided with pain medication and an
ultrasound test was performed.  Dr. Selleck admitted him to the
hospital and, on March 30, 2007, Smith underwent surgery.  He
says the stone was not removed but, instead, a stent was
inserted.  The following day Smith was discharged, with both a
stent and a catheter, and returned to the prison infirmary.

On April 9, 2007, Smith was again transported to the hospital, for a post-surgical follow-up visit with the treating urologist.  Dr. Selleck explained that he planned to leave the stent in place until he could operate again in a couple of weeks. Smith was returned to the prison infirmary and, the following day, the catheter was removed.  Smith was then released back to his unit.  He claims that he had been prescribed various medications for pain, bladder spasms, and to prevent infection, but says he did not receive them.  Within a few days (Smith does not provide the date), he says he finally received the antibiotics that had been prescribed.  On April 23, Smith submitted an Inmate Request Slip ("IRS") to Warden Richard Gerry, thanking him for helping Smith get the medications he needed. Exhibit F to defendants' memorandum (document no. 17-8).[1]

---

[1]     The NHSP has a three-tiered administrative grievance procedure.  See Exhibit A to defendants' memorandum (document no. 17-3), New Hampshire Department of Corrections Policy and Procedure Directive ("PPD") 1.16, entitled "Complaints and Grievances by Persons under DOC Supervision."  See also LaFauci v. N.H. Dep't of Corrections, 2001 DNH 204 at 7-10 (D.N.H. Oct. 31, 2001).  Those administrative regulations provide, among other things, that inmates must invoke the grievance process (by filing an inmate request slip) within 30 calendar days of the date on which the event(s) forming the basis of any complaint occurred. PPD 1.16 IV.  If the inmate is not satisfied with the response to his request slip, he has an additional 30 days within which to file a grievance with the warden.  If the inmate is dissatisfied with the warden's response, he is afforded another 30-day period within which to file a grievance with the Commissioner of Corrections.

Over the course of the next week, Smith began feeling
better.  But, on April 27, 2007, Smith says he again began
experiencing pain.

> For the rest of the month I was switched from one
> antibiotic to another, trying to get the infections
> under control, which never happened.  As a result of
> the earlier failure to get me appropriate antibiotics,
> the infections had gotten out of control, this would
> cause me problems for the next five and a half months.

Smith affidavit at para. 16.  Smith does not, however, provide
any expert medical testimony (or other relevant evidence) to
support his implicit suggestion that defendants actually provided
him with "inappropriate" antibiotics or that their conduct
somehow caused his infections to get "out of control."  And, more
importantly, Smith points to no evidence suggesting that one or
more of the defendants was deliberately indifferent to his
serious medical condition.

On May 3, 2007, Smith submitted an IRS to nurse practitioner
Brett Mooney inquiring about his antibiotics (Cipro and
Nitrofurantoin) and mentioning that he had seen "Dr. Englander
yesterday because things were going down hill again."  Exhibit F
to defendants' memorandum.  Mooney told Smith that he should
address his questions directly to Dr. Englander during sick call.
On May 17, 2007, Smith was again taken to Catholic Medical
Center, where he underwent a second operation to treat his

6

condition.  He says Dr. Selleck explained that he planned to try
to break up the kidney stone using a laser.  But, a few hours
after surgery, Smith says the doctor informed him that, due to
the stone's odd location in the kidney (which, according to
Smith, was itself located somewhat atypically in his abdomen), he
was not able to remove it or break it up.  Instead, the doctor
inserted a larger stent and told Smith he wanted to run some more
tests before he tried to remove the stone again.  Accordingly,
Smith was returned to the prison.

Four days later, on May 21, 2007, Smith submitted an IRS to
Dr. Englander, asking about follow-up treatment in light of the
fact that his most recent surgical procedure had not been fully
curative.  Dr. Englander responded that she wanted to have a CT
scan performed, so they might know whether the stone was still
present and, if it was, she wished to schedule another surgical
procedure to have it removed.  Exhibit H to defendants'
memorandum.  Then, on May 25, 2007, Smith submitted an IRS to
nurse practitioner Corina Neculai, stating, "Mam, I'm sorry
because you were correct.  My appointment with you was May 24,
2007.  I wrote it on the calendar wrong.  There are a couple
issues I would like to speak about but [they] are not pressing,
so unless they get to be, I will wait until my next time to see
you."  Exhibit I to defendants' memorandum.  Nurse Neculai

responded, telling Smith that, "You'll soon have more imaging tests done, then back to specialist, etc.  We are all (Dr. Englander, ARNP Mooney, myself, specialists on outside) working to best resolve your problem(s)."  Id.  Three days later, on May 28, 2007, Smith submitted an IRS to ARNP Mooney, asking about the antibiotics he had been prescribed.  He was apparently confused by a label suggesting that the drugs were used to treat tuberculosis and meningitis, and wondered whether he had been diagnosed with one of those illnesses, but not informed.  Exhibit J to defendants' memorandum.  She responded by apologizing for his confusion and explaining that the antibiotic prescribed for him was "only 1 of 2 that treat [his] persistent urinary infection."  Id.

In the following weeks, Smith says he suffered severe infections and debilitating pain.  He complains that, due to an administrative "screw-up," someone neglected to schedule (or perhaps even cancelled) an appointment for some sort of unspecified testing.  That, says Smith, caused him to have to make two "useless" visits to Catholic Medical Center to follow-up on tests that were never actually performed.  The next date Smith identifies in his affidavit is July 12, 2007 – a day he says was "very rough," prompting him to seek treatment at the infirmary.

> I was seen by the same nurse.  Brad Bowen, who again
> didn't know what to do.  He took a urine sample and
> wrote for a thirty day bed-rest lay in.  The urine
> tests showed that the infections were out of control
> that I needed injections of antibiotics, Gentamicin 80
> mg. every eight hours, in addition to the ones I was
> already taking.  They didn't work.  I was also given
> 1000 mg. of Vicodan [sic] four times a day.

Smith affidavit at para. 21.  On July 15, 2007, Smith submitted

an IRS to defendant Donna Timulty, asking whether he had been

scheduled for another procedure aimed at breaking up or

dissolving the stone.  He stated that "if the problem [scheduling

the medical procedure] is with Maine, I can get my mother to call

the Maine Commissioner [of Corrections] – he is a friend of the

family."  Exhibit K to defendants' memorandum.  Timulty responded

by letting Smith know that a procedure had, in fact, already been

scheduled for him.


On August 9, 2007, Smith returned to Catholic Medical Center

and underwent a third surgical procedure.  According to Smith,

the treating surgeon explained that "she would try everything she

could because she knew [he] had been suffering for a long time."

Smith's affidavit at para. 22.  After the procedure, Smith says

the doctor reported that she wasn't sure if she had

removed/broken-up the entire stone, but he would soon know

because he "should pass 'gravel.'"  Id.  He was returned to the

prison, where he says he continued to experience severe pain.  On

9

August 17, 2007, Smith returned to the infirmary because he was
"in constant pain." Id. There, Smith says one of the defendant
nurses told him, "I can't help it if you aren't getting the
treatment you need.  It's Maine!  They just keep cancelling the
appointments I make." Id. at para. 23.  That statement is an
apparent reference to the appointments Smith says were scheduled
for him to undergo various forms of testing but, because of an
administrative "screw-up," were cancelled.  Parenthetically, the
court notes that the statements attributed to the defendant nurse
(Donna Timulty) suggest that she had actually scheduled the
testing appointments but someone in the Maine Department of
Corrections cancelled them.  The Maine D.O.C. employees are not
defendants in this case.

    Three days later, on August 20, 2007, Smith says his mother
contacted various officials in the State of Maine, who assured
her that they had resolved "any issues which may have caused
delays in processing medical consultation/treatment requests for
[Smith]." Id. at para. 24.  On August 24, 2007, Smith was taken
to the hospital for a CAT scan, to determine whether the stone
had passed.  He was also prescribed 1000 mg. of Vicodin.  And, on
August 30, 2007, Smith met with Dr. Selleck, who reviewed the CAT
scan.  Unfortunately, he could not tell whether the stone had
passed or whether it remained lodged in Smith's kidney.

Accordingly, he prescribed antibiotics and scheduled Smith for another surgical procedure.  On September 9, 2007, Smith underwent his fourth and final procedure, which apparently completely cured him and alleviated his pain.

The essence of Smith's Eighth Amendment claim is that "it took six months to treat a kidney stone due to the prison's untimely, inadequate and unprofessional treatment."  Smith's affidavit at para. 28.

## Discussion

I.   The Eighth Amendment and Medical Mistreatment.

In order to prevail on a section 1983 claim for medical mistreatment, an inmate must show that prison officials demonstrated "deliberate indifference to [his] serious medical needs."  Estelle v. Gamble, 429 U.S. 97, 106 (1976).  This test has both objective and subjective (state-of-mind) components. See DesRosiers v. Moran, 949 F.2d 15, 18 (1st Cir. 1991).

With regard to the objective component of the deliberate indifference test, the inmate must show that he or she has suffered a serious deprivation of a fundamental right or basic human need.  See DesRosiers, 949 F.2d at 18.  As the Supreme Court has observed, the Constitution "does not mandate

comfortable prisons, and only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." Wilson v. Seiter, 501 U.S. 294, 298 (1991) (citation and internal quotation marks omitted).  And, in Farmer v. Brennan, 511 U.S. 825 (1994), Justice Souter explained the state-of-mind element of deliberate indifference in the context of an Eighth Amendment claim.  Id. at 834-47.  In short, a prison official is liable "only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."  Id. at 847.

Accordingly, an Eighth Amendment medical mistreatment claim cannot be premised upon a theory of simple negligence or even medical malpractice; a medical care provider's conduct must go beyond negligence in diagnosing or treating a prisoner's medical condition.  See Estelle, 429 U.S. at 105-06.  Similarly, a constitutional violation does not occur merely because a prisoner happens to disagree with a nurse's or physician's decision regarding the proper course of medical treatment.  See, e.g., Ruiz-Rosa v. Rullan, 485 F.3d 150, 156 (1st Cir. 2007) ("[S]ubstandard care, malpractice, negligence, inadvertent failure to provide care, and disagreement as to the appropriate course of treatment are all insufficient to prove a

constitutional violation."); <u>Watson v. Caton</u>, 984 F.2d 537, 540 (1st Cir. 1993) ("The courts have consistently refused to create constitutional claims out of disagreements between prisoners and doctors about the proper course of a prisoner's medical treatment, or to conclude that simple medical malpractice rises to the level of cruel and unusual punishment.").

Instead, to be violative of the Eighth Amendment, the "care provided must have been so inadequate as to shock the conscience," <u>Feeney v. Corr. Med. Services, Inc.</u>, 464 F.3d 158, 162 (1st Cir. 2006) (citations and internal punctuation omitted), or "constitute 'an unnecessary and wanton infliction of pain' or be 'repugnant to the conscience of mankind.'" <u>Estelle</u>, 429 U.S. at 105-06 (citations omitted).

II. Defendants' Treatment of Smith.

For purposes of ruling on the pending motions for summary judgment, the court has assumed (without ruling) that Smith timely exhausted available administrative remedies at each of the three tiers in the NHSP's inmate grievance system.[2]

---

[2]    Although Smith filed several inmate requests slips (the first of three steps in the administrative process) questioning the treatment he was receiving and/or the medications he was provided, and/or the scheduling of surgical procedures, he did not timely appeal any of the responses he received.  It was not until September of 2007 (six months after the onset of his illness) that Smith completed the mandatory three-step

Turning to the merits of Smith's claims, it is plain that the record in this case simply fails to lend itself to even an inference that any of the individual defendants was deliberately indifferent to Smith's serious medical condition or that the treatment he received was so far below the standard of care as to shock the conscience.  Suffering from kidney stones can be extremely painful.  And, as Smith himself acknowledges, his situation was complicated by his atypical anatomy (i.e., the uncommon location and/or structure of his kidney), the large size of the stone, and the stone's unusual location within the kidney. Nevertheless, the record demonstrates that defendants consistently took reasonable steps to address both Smith's underlying condition and its symptoms (the kidney stone and associated pain and, eventually, infection).  While it is certainly understandable that Smith would have preferred to have his situation medically corrected far sooner, nothing in the record suggests that he received sub-standard care.  Nor has Smith proffered any expert testimony to suggest that the medical care he received was inappropriate (the date for plaintiff's expert witness disclosure passed more than four months ago).

administrative appeals process, by filing an IRS, appealing the response to the warden, and then to the commissioner.  <u>See</u> Exhibits T, V, and X to defendants' memorandum.  At that point, however it would certainly appear that his appeals were not timely, since each of the specific events of which he complains had occurred far more than 30 days earlier.

14

Finally, even if the record did support such a conclusion, that would not be sufficient.  As noted above, Smith must do more than merely show that defendants were negligent.  Instead, he must show that they were aware of, yet were deliberately indifferent to, his serious medical condition.

Although defendants (and medical professionals at two local hospitals) had difficulty treating Smith's kidney stone and the resulting pain and infections, they appear to have undertaken entirely reasonable and medically appropriate measures aimed at addressing Smith's condition.  While Smith's claims (if credited as true) suggest that one or more of the named defendants could have been a bit more sympathetic, nothing suggests that they were deliberately indifferent.  To the contrary, his condition was continually treated.  Absent expert medical testimony suggesting that defendants' treatment of Smith was so far below acceptable medical standards as to constitute an unnecessary and wanton infliction of pain or be repugnant to the conscience of mankind, Smith cannot prevail on his Eighth Amendment claim on the undisputed facts.

## Conclusion

The record suggests that Smith is well-liked both by fellow inmates and prison staff, and nothing indicates that any of the

named defendants had any reason to deliberately cause him needless pain or suffering.  No one seriously doubts that he experienced substantial pain as a result of his kidney stone and related infection(s).  Nor does there appear to be any question that it took medical providers at the prison and doctors at two local hospitals approximately six months and four surgical procedures to finally resolve Smith's medical problems.

But, the fact that Smith endured several months of discomfort (punctuated by periods of severe pain) does not, standing alone, compel the conclusion that any one or more of the defendants was deliberately indifferent to his serious medical needs.  Even if Smith had been able to demonstrate that defendants were negligent in treating his kidney stone, his Eighth Amendment claim still fails, since mere negligence or simple medical malpractice does not rise to the level of cruel and unusual punishment, nor does it constitute deliberate indifference to serious medical needs.  Instead, Smith must point to some evidence from which a trier of fact might reasonably conclude that one or more of the named defendants knew that he faced a substantial risk of serious harm yet, nevertheless, disregarded that risk by failing to take reasonable measures to abate it.  Farmer, 511 U.S. at 847.  Here, there is simply a dearth of evidence on that essential point.  Of course, "where

16

the dispute concerns not the absence of help, but the choice of a
certain course of treatment, . . . deliberate indifference may be
found where the attention received is so clearly inadequate as to
amount to a refusal to provide essential care." <u>Feeney</u>, 464 F.3d
at 163.  As in <u>Feeney</u>, however, the record here "unequivocally
demonstrates that this is not such a case." <u>Id</u>.


     Consequently, even if Smith had properly (and timely)
exhausted available prison administrative remedies, he has failed
to point to evidence supportive of his claim that defendants
subjected him to cruel and unusual punishment by displaying
deliberate indifference to his serious medical condition.  For
the foregoing reasons, defendants' motion for summary judgment
(document no. 17) is granted, and plaintiff's motion for summary
judgment (document no. 26) is denied.  Defendant's motion to
strike (document no. 27) is denied as moot.  The Clerk of Court
shall enter judgment in accordance with this order and close the
case.

          **SO ORDERED.**

                              _____
                              Steven J. McAuliffe
                              Chief Judge

June 23, 2009

cc:  Joel L. Smith, <u>pro</u> <u>se</u>
     James W. Kennedy, Esq.

                              17